Suzanne S. HARRIS, individually and as Chairman of the Jefferson County Republican Executive Committee, Nelda S. Rowan and the Jefferson County Republican Executive Committee, Plaintiffs-Appellees,

v.

Polly CONRADI, O. H. Florence and Missouri Yarbrough, as Members of Appointing Board of Jefferson County, Alabama, Defendants-Appellants.

No. 80–7975.

United States Court of Appeals, Eleventh Circuit.

May 13, 1982.

---

* Judge Hill is recused and Judge Anderson is disqualified. Neither Judge participated in this decision.

William W. Conwell, John S. Foster, Birmingham, Ala., for defendants-appellants.

Edward Still, Birmingham, Ala., for amicus curiae Alabama Democratic Party.

Edward S. Allen, John P. Scott, Jr., Birmingham, Ala., for plaintiffs-appellees.

Before TUTTLE, HENDERSON and CLARK, Circuit Judges.

HENDERSON, Circuit Judge:

The appellees Harris, Rowan and the Jefferson County Republican Executive Committee, representing themselves as well as a class denominated as Republican voters and all citizens "interested in insuring the fair, impartial and honest conduct of the General Election," filed a complaint pursuant to the provisions of 42 U.S.C. § 1983 in the Northern District of Alabama naming as defendants the three county officials who comprise the Jefferson County Appointing Board (the Board). The Board appoints officials

to conduct elections.[1] These election officials perform a variety of nondiscretionary tasks such as folding ballots and marking electors' names off the registration lists.[2] The complaint alleged that the members of the Board "refused and failed to appoint, as nearly as practicable, an equal and representative number of election officials representing the Republican Party of Jefferson County at each voting place from the said list of the Jefferson County Republican Executive Committee in deprivation of plaintiffs' rights of association and assembly and of equal protection of the laws in violation of the rights secured by the First and Fourteenth amendments to the Constitution of the United States." Record, Vol. I at 60. The list to which the plaintiffs refer is the list of nominations submitted by the Republican Executive Committee to the appointing board pursuant to the Ala.Code § 17·6-6, which reads:

> Each political party or organization having made nominations may, by the chairman of its state or county executive committee or nominees for office, furnish the appointing board a list of not less than three names of qualified electors from each voting place, and from each of said lists an inspector and clerk shall be appointed for each voting place; provided, that where there are more than two lists filed, the appointments shall be made from the lists presented by the two politi-

cal parties having received the highest number of votes in the state in the next preceding regular election, if each of said parties present a list.

Also material to the management of elections in Jefferson County is Ala. Acts 1956, No. 18, § 5 at 38, which applies only to Alabama counties having a population of 400,000 or more [3] and which, in relevant part, provides:

> For each voting center where only one (1) machine is used there shall be a Chief Inspector, an Assistant Chief Inspector, and two (2) Clerks. For each additional machine, there shall be one (1) additional Clerk.

The Board, comprised of elected officers all of whom are Democrats, appointed 199 of the 316 Republicans nominated to fill the 782 available positions as election officials.[4] Based on this evidence, the plaintiffs sought injunctive relief, a judgment declaring Act No. 18, *supra*, unconstitutional and punitive and compensatory damages of $50,000.00. In response, the defendants Conradi and Yarbrough submitted an affidavit attesting that "[f]or every voting place where names were submitted for an Inspector and Clerk by the Republican Party, the Election Commission appointed an Inspector and Clerk, as provided for in [section] 17-6-6." Supp. Record, Vol. I at 2.[5] Both sides then moved for summary judgment. The district court

1. When this lawsuit was initiated, Ala.Code § 17-6-1 provided:

    The judge of probate, sheriff and clerk of the circuit court, or a majority of them, acting as an appointing board, must, not more than 20 nor less than 15 days before the holding of any election in their county, appoint from the qualified electors of the respective voting places three inspectors and two clerks for each place of voting, and returning officer for each precinct, to act at the place of holding elections in each precinct. In 1980 this section was amended to prohibit the appointment of members of a candidate's family or political committee as election officials.

2. Inspectors are responsible for numbering and folding marked ballots and calling the name of the voter to clerks who then write it down on separate lists. Ala.Code §§ 17-8-13, -34, ·35. Inspectors also receive elector challenges and

administer the oath to challenged voters. Ala. Code §§ 17-12-1, -3.

3. Jefferson County is the only county in Alabama having a population of 400,000 or more.

4. In the 64 polling places complained of, 71 more Republicans were appointed than required. Those statistics do not cover all the polls, so we do not have the overall picture as to how many more Republicans were appointed than mandated countywide.

5. This fact seems to be in dispute. A comparison of the ·published names of officials appointed with the list of candidates submitted by the Republicans shows that in at least seven polling places fewer Republicans were appointed than required by Alabama law. The discrepancy is not material here, however, since we are not concerned with a violation of Alabama law.

first concluded that "[i]f the aforementioned state election statutes and the application of such laws by the defendants apply discriminatory standards to opposing political parties, there is a violation of the provisions of the fourteenth amendment,"[6] and went on to find that it "must apply a strict standard of review if the aforementioned state election statutes and their application of such laws by the defendants deny equal protection and limit a first amendment freedom."[7] After finding that "there is certainly no conceivable purpose served in denying equal representation to either of the two political parties," the court noted that it should, to the extent possible, avoid a construction of state statutes which would result in a denial of the plaintiffs' constitutional rights or which would produce inconsistency in state law. The court then construed Ala.Code §§ 17-6-6, 17-6-9[8] and Ala. Acts 1956, No. 18 *in pari materia* and found "that the legislative intent that inspectors and clerks at each polling place using voting machines be appointed equally between the two political parties ... is implied." After finding that the defendants had not appointed, to the extent practicable, an inspector and an equal number of clerks for each polling place in Jefferson County from both the party rosters, the

court granted summary judgment in favor of the plaintiffs and issued a permanent injunction against the defendants. We reverse.

We begin by noting that the district court incorrectly interpreted Ala.Code § 17-6-6. The court, in reading the state statutes in a manner which it felt was necessary to avoid "an unconstitutional denial of equal protection of the laws," ignored a decision of the Supreme Court of Alabama handed down two years earlier which held that:

> We do not believe that the legislature intended to require the appointment of election officers in equal proportion nor did it establish any mathematical formula for such appointments. [Section] 17-6-6, as we read it, simply requires the appointing board to make its selection of election officers from lists provided by the two major political parties.

*The Mobile County Republican Executive Committee v. Mandeville*, 363 So.2d 754, 758 (Ala.1978).

The district court's laudable desire to avoid an unconstitutional construction of a state statute was not aided by disregarding the Alabama Supreme Court's view of the Alabama law.[9] In *Bank of Heflin v. Miles,*

---

**6.** In support of this proposition, the district court cited *Hadnott v. Amos*, 320 F.Supp. 107 (M.D.Ala.1970), *aff'd*, 401 U.S. 968, 91 S.Ct. 1189, 28 L.Ed.2d 318 (1971), *aff'd*, 405 U.S. 1035, 92 S.Ct. 1304, 31 L.Ed.2d 576 (1972). In that case, the court held that Alabama could not constitutionally apply discriminatory standards in determining whether to print a party's emblem on the ballot. After noting that party emblems printed on the ballot are "of major significance to each party in seeking straight ticket voting and to every voter who wishes to vote a straight ticket," the court observed that party emblems were "of particular importance to the voter who is less schooled or even illiterate." *Id.* at 111. In *Hadnott*, there was a clear relation between the state's actions and the right to vote. The case cannot stand for the broad proposition that any discrimination between political parties, without more, violates the fourteenth amendment.

**7.** This articulation of the function of the strict standard of review places the cart before the horse. Where this standard is appropriate, it is employed to determine whether a statute violates the fourteenth amendment. It is incorrect

to state that the strict standard is invoked as a result of a finding of unconstitutionality. *See, e.g., Storer v. Brown*, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974).

**8.** Ala.Code § 17-6-9 states:

> If no lists are furnished as provided in section 17-6-6, the appointing board shall appoint inspectors, two of whom shall be members of opposing political parties, if practicable, and shall appoint clerks from opposing political parties, if practicable.

**9.** Although the court considered §§ 17-6-6, 17-6-9 and Ala. Acts 1956, No. 18, § 5 *in pari materia*, it is clear that the latter two statutes do not make reference to the political affiliation of election officials and had no bearing on the court's interpretation of the law other than its finding that they do not change the operation of the general statute in Jefferson County. Such an approach does not alter the fact that the district court was bound by the decision of the Alabama Supreme Court in *Mandeville*.

621 F.2d 108, 113–14 (5th Cir. 1980), the court reaffirmed the settled rule that

> State courts have the right to construe their own statutes. *Beal v. Missouri Pac. R. R. Corp.*, 312 U.S. 45, 61 S.Ct. 418, 85 L.Ed. 577 (1941); *City of Miami v. Sutton*, 181 F.2d 644 (5th Cir. 1950). Once the state court has construed the statute, federal courts are bound by that construction. *Hortonville Joint School Dist. No. 1 v. Hortonville Educ. Ass'n.*, 426 U.S. 482, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976); *Woods v. Holy Cross Hospital*, 591 F.2d 1164 (5th Cir. 1979).

See also *Reynolds v. Georgia*, 640 F.2d 702 (5th Cir.); *cert. denied*, ── U.S. ──, 102 S.Ct. 326, 70 L.Ed.2d 165 (1981).

■ The district court therefore erred in not following the declaration of the Alabama Supreme Court as expressed in *Mandeville*. However, because the district court believed that any interpretation of the statute other than its own would render the law unconstitutional, we turn to the constitutionality of the Board's practices and § 17–6–6.

■ While state power may not be used as "an instrument for circumventing a federally protected right," such as the right to vote, *Reynolds v. Sims*, 377 U.S. 533, 567, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), it is also clear that a state has a substantial interest in the management of its elections, *Democratic Party of the United States v. La Follette*, 450 U.S. 107, 101 S.Ct. 1010, 67 L.Ed.2d 82 (1981), and the procedure utilized in holding elections may not be altered by federal courts unless state laws or practices violate federal statutes or the Constitution. *U.S.Const.*, art. I, § 4; *see Reynolds v. Sims, supra.* In attempting to prove a state infringement of the constitutionally protected right to vote, it is not enough merely to show facts related to the management of elections and then allege a viola-

tion of the fourteenth amendment. It is fundamental that an aggrieved party must go further and demonstrate how these facts cause an impairment of that right. The plaintiffs here have failed to satisfy that burden. In neither the record from the district court nor the briefs and arguments in this court is there any indication that the defendants' failure to appoint an equal number of Republicans as election officials affected any person's right to vote. Significantly, there has been neither allegation nor proof of fraud resulting from the Alabama appointment system. *See Moore v. Kusper*, 465 F.2d 256 (7th Cir. 1972).[10] The appellees cite two types of cases to support their contention that a causal connection need not be shown between demonstrated facts and an alleged constitutional violation. Both lines of cases are inapposite. One group stands for the proposition that illegalities resulting in a denial of the right to vote, will invalidate an election "simply for its lack of integrity." *Griffin v. Burns*, 570 F.2d 1065, 1080 (1st Cir. 1978); *Bell v. Southwell*, 376 F.2d 659 (5th Cir. 1967); *see Hamer v. Campbell*, 358 F.2d 215 (5th Cir.), *cert. denied*, 385 U.S. 851, 87 S.Ct. 76, 17 L.Ed.2d 79 (1966). In each of these instances, however, the facts disclose a clear violation of the right to vote and the controversy stemmed from the choice of an appropriate remedy. Here, there has been no allegation or proof of fraud and we do not believe that the naked possibility that election officials will violate their oaths demands the conclusion that the election administrative process "lacks integrity."

Our attention is next directed to *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927), in which the Supreme Court found a violation of due process because the judge in a criminal case was also the financial officer of the town that would profit from any fine levied against the defendant.

10. We note that Ala.Code §§ 17–6–8, 17–9·29 provide that poll watchers representing each political party having candidates in the election have the right to observe and inspect all of the voting and tabulation proceedings at every polling place. The institution of prophylactic measures designed to prevent election fraud, such as the appointment of poll watchers and bipartisan election officials, is a matter for consideration by state legislatures. We simply hold that the Constitution does not require the states to take steps to remedy a constitutional infirmity which does not exist.

The Court held that it was irrelevant whether the judge himself would receive any profit because the system would permit a defendant to *reasonably* say "that he feared he could not get a fair trial . . . from one who would have so strong a motive to help his village by conviction and a heavy fine." *Id.* at 533, 47 S.Ct. at 444. Many of the functions of a judge involve discretion. It is not surprising, then, that the Court invoked a due process requirement that criminal justice be administered in an objectively impartial manner to instill confidence that the judge's discretion is not subject to corrupt influence. A reasonable objective impartiality necessarily relates to the amount of discretion the principle actors enjoy within the system. In Alabama, the duties of election officials are carefully defined and completely devoid of discretion; election officials either perform their functions or criminally violate their oaths. In light of the mechanical role of election workers, it certainly is not reasonable to harbor fears of election fraud absent allegations and proof of some fraudulent behavior on the part of these officials. The Alabama statutory scheme or practices employed in appointing election officials simply do not have any impact whatsoever on the right to vote or the counting of those votes.

▪ Nor can it be said that the appointment of more Democrats than Republicans evidences a violation of the fundamental right to associate for the purpose of advancing shared political beliefs. While it is clear that the government may not deny a benefit to an individual on the basis of his political beliefs by firing or refusing to hire

him, *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Tanner v. McCall*, 625 F.2d 1183 (5th Cir. 1980), *cert. denied*, 451 U.S. 907, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981), it certainly does not follow that a state government must designate a specified number of members of any political party without regard to qualifications simply because such a requirement would make membership in the party more desirable or attractive. The appellees did not proceed on the theory that party membership was a substantial motivating factor in the Board's hiring practices so that its failure to hire Republicans infringed on the party members' right of association. *See Branti v. Finkel, supra; Barrett v. Thomas*, 649 F.2d 1193 (5th Cir. 1981). In its posture before us, this case simply does not involve a question of illegal discrimination in employment.

▪ Equally ineffective is the argument that any illegal discrimination against members of the plaintiffs' political party might have resulted from the Board's practices.[11] A successful prosecution of such a claim requires a showing of purposeful discrimination by the defendants. *E.g., City of Mobile, v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980); *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). The plaintiffs offered no competent evidence of any purposeful discrimination against them as a class.[12]

Because the Alabama election statutes and the defendants' appointment practices do not offend constitutional principles, summary judgment was improperly granted

---

11. The appellees claim that this discrimination appears in two forms. Initially they assert that they have not been treated equally with Jefferson County Democrats. They also complain that, due to the operation of Act No. 18, *supra*, in Jefferson County they are entitled to only two Republican election officials at each poll regardless of the total number of officials working there. Twenty-three persons were appointed to serve in the largest polling place, so the ratio of Republican representation there could be as low as two out of twenty-three. In much of the rest of the state, however, only five officials are present in each election place,

so Republican representation is a constant two out of five. The district court held that both the failure to appoint an equal number of Republican party members and the disparate representation of Republicans in Jefferson County as compared to the rest of the state supported a finding of a violation of equal protection. Record, Vol. 1 at 174, n.4. *But see*, II Ala. Acts 1965, No. 812 at 1515 (similar system for determining the number of clerks to work at each poll in Mobile County).

12. The statistics in evidence do not represent all of the polling places. See note 3, *supra.*

and the case must be remanded to the district court.

REVERSED and REMANDED.