786 F.2d 1023
 Howard VINTSON, Individually and as Chairman of the Walker
County Republican Executive Committee; Leonard Wilson,
Individually and on behalf of all others similarly situated;
and Joan Pile, Individually and on behalf of all others
similarly situated, Plaintiffs-Appellants,
v.
Sylvester ANTON; Stanley Wade; and Joel Robinson,
Individually and as Members of the Appointing Board of
Walker County, Alabama; and Walker County, a political
subdivision of the State of Alabama, Defendants-Appellees,
Woodrow Wyers, Sr., and Steve Adkins, individually and on
behalf of all persons who may be nominated by the Walker
County Democratic Executive Committee Chairman as election
officials, Defendants-Intervenors.
 No. 84-7776.
 United States Court of Appeals,
Eleventh Circuit.
 April 14, 1986.
 
 Albert L. Jordan, Fitzpatrick & Jordan and Raymond Fitzpatrick, Birmingham, Ala., for plaintiffs-appellants.
 Edward Still and Susan Williams Reeves, Birmingham, Ala., for defendants-appellees.
 Appeal from the United States District Court for the Northern District of Alabama.
 Before TJOFLAT and KRAVITCH, Circuit Judges, and DUMBAULD*, Senior District Judge.
 DUMBAULD, Senior District Judge:
 Appellants' "beef"[1] or grievance in the case at bar is that one of them (Joan Pile) and a number of other Republicans were not appointed as election officials at their voting precincts in Walker County, Alabama for the election of November 2, 1982.[2]
 Violation is alleged of the guarantee to every State of "a Republican Form of Government;"[3] as well as of the Freedom of Speech[4] and Equal Protection[5] clauses.
 Appellants base their claim on Elrod v. Burns, 427 U.S. 347, 375, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976) and Branti v. Finkel, 445 U.S. 507, 517-18, 100 S.Ct. 1287, 1294-95, 63 L.Ed.2d 574 (1980). The extent of the actual holding in Elrod, notwithstanding the philosophical generalizations to be found in Mr. Justice Brennan's "wide-ranging opinion" (427 U.S. at 374, 96 S.Ct. at 2690), is to be measured by Mr. Justice Stewart's statement[6] (427 U.S. at 375, 96 S.Ct. at 2690) that
 "The single substantive question involved in this case is whether a nonpolicy-making nonconfidential government employee can be discharged or threatened with discharge from a job that he is satisfactorily performing upon the sole ground of his political beliefs. I agree with the plurality that he cannot."
 As appellants recognize, the Elrod criterion of whether a job is confidential or policy-making was modified in Branti so as to inquire whether party affiliation is an appropriate requirement for the effective performance of the public office involved.
 As stated in the opinion of Mr. Justice Stevens in Branti (445 U.S. at 517-18, 96 S.Ct. at 1294-95)
 
 
 1
 Both opinions in Elrod recognize that party affiliation may be an acceptable requirement for some types of government employment.... As one obvious example, if a State's election laws require that precincts be supervised by two election judges of different parties, a Republican judge could be legitimately discharged solely for changing his party registration. That conclusion ... would simply rest on the fact that party membership was essential to the discharge of the employee's governmental responsibilities.... In sum, the ultimate inquiry is ... whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.
 
 
 2
 Appellants admit that Alabama constitutionally may, as all States do, so far as we are aware, follow the practice of requiring bipartisanship in the composition of election boards. Such adversary partisan confrontation is universally regarded as an effective means of preventing fraud and ensuring honest elections.[7]
 
 
 3
 The practice of requiring representation of both parties on election boards is simply an application to the electoral process of the adversary system which characterizes the judicial process under the Anglo-American common law. We are aware that critics have asserted that the adversary system may not possess all the excellencies which are commonly supposed to characterize it, and that the inquisitorial procedure of Continental and especially Scandinavian countries may perhaps be equally effective in promoting accertainment of truth and fairness in administration of justice.[8] But even if it is an illusion "that the ultimate good desired is best reached by free trade in ideas--that the best test of truth is the power of the thought to get itself accepted in the competition of the market," nevertheless, as Justice Holmes declared in his well-known dissenting opinion in Abrams v. U.S., 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919), "That, at any rate is the theory of our Constitution."[9]
 
 
 4
 Similarly, in regulating elections States may in accordance with our constitutional tradition rely upon the confrontation at the polling place of alert representatives and advocates of conflicting and clashing partisan beliefs as an effective means to prevent fraudulent practices and promote the public interest in honest electoral procedures and effective popular government.
 
 
 5
 For a job of this kind, as recognized by Branti, genuine partisanship and commitment to the cause of one of the contestants in the political struggle is an essential and indispensable qualification (just as in a football game the coaches and players on each side must be unwaveringly committed to the success of their team).
 
 
 6
 Election officers in Walker County, Alabama, are appointed by a board consisting of the Probate Judge of the County, of the Sheriff, and of the Clerk of the Circuit Court (Alabama Code, 1975, Sec. 17-6-1). (In the 1982 general election, since the Sheriff was a candidate for relection he was replaced (in accordance with Ala.Code Sec. 17-16-3) by a qualified elector). The appointments are required by law to be made from lists submitted by the county chairmen of the two parties that received the highest number of votes in the preceding election "if each of said parties present a list" and "there are more than two lists filed" (Ala.Code Sec. 17-6-6). The pertinent provision reads that "Each political party ... may ... furnish the appointing board a list of not less than three names of qualified electors from each voting place, and from each of said lists an inspector and clerk shall be appointed for each voting place." In 1982 only the Democratic and Republican parties presented lists.
 
 
 7
 Another relevant provision is Ala.Code Sec. 17-6-9 which provides:
 
 
 8
 If no lists are furnished as provided in Section 17-6-6, the appointing board shall appoint inspectors, two of whom shall be members of opposing political parties, if practicable, and shall appoint clerks from opposing political parties, if practicable.
 
 
 9
 This section is not operative in the case sub judice, since it applies only if "no lists " are furnished as provided in section 17-6-6. Here both parties furnished lists, though only the Democratic list met the description "as provided in section 17-6-6." The Republican list did not qualify as complying with section 17-6-6 since it provided only two names (rather than three, as provided in section 17-6-6, supra ).
 
 
 10
 Nevertheless, section 17-6-9 is significant in the case at bar as establishing the existence of the requirement of bipartisanship under Alabama law in connection with the appointment of election officials.
 
 
 11
 The same commitment to bipartisanship is discernible in Sec. 17-6-6 where it is directed that "from each of said lists [furnished by each political party] an inspector and clerk shall be appointed for each voting place."
 
 
 12
 Section 17-6-6 must be considered in connection with Section 17-6-1 (calling for appointment of "three inspectors and two clerks for each place of voting, and returning officer for each precinct") and with section 17-9-23 which provides that "The election officers for each voting district shall consist of an inspector, a chief clerk and a first and second assistant clerk." Section 17-9-23 relates to precincts with voting machines, and would take precedence over the other sections which were apparently enacted before 1980, at a time when paper ballots were used.[10] Where only four election officers are to be appointed, it would seem unfair to choose two of them (amounting to 50 per cent) from a minority party, as appellants would wish.
 
 
 13
 In any event, in Walker County there was an absentee box (still using paper ballots) for which the Democrats submitted six names and the Republicans three. The Democrats proposed four names for each of the 99 machine precincts, and the Republicans proposed two names for 82 such precincts, and only one for 17 of them.
 
 
 14
 The appointing Board named four election officials for each machine district, of whom as a rule three were Democrats and one Republican. For the absentee box five Democrats and one Republican were appointed. In all approximately 290 Democrats and 112 Republicans were chosen. Appellants have not identified any precincts where no Republican was appointed. It would thus appear that the mandate of bipartisanship was satisfied, and that there was adversary partisan confrontation at each voting place, in accordance with Alabama's policy.
 
 
 15
 Only from an extreme doctrinaire standpoint is it possible to discern any similarity between a person wishing to serve as an election officer and a tenured academic professional or a recipient of welfare relief who are deprived of benefits financed by government because of their having exercised their constitutional rights and courageously spoken out as a "whistleblower" in the public interest. Cf. Perry v. Sindermann, 408 U.S. 593, 598, 92 S.Ct. 2694, 2698, 33 L.Ed.2d 570 (1972); Pickering v. Board of Education, 391 U.S. 563, 574, 88 S.Ct. 1731, 1737, 20 L.Ed.2d 811 (1968); Alicea Rosado v. Garcia Santiago, 562 F.2d 114, 117 (1st Cir.1977); Goldberg v. Kelly, 397 U.S. 254, 266, 90 S.Ct. 1011, 1019, 25 L.Ed.2d 287 (1970).
 
 
 16
 In the real world of practical life the employment (if it properly may be called that) which is at stake here does not constitute anyone's means of livelihood. It is probably not a recognized occupation or calling listed in the vocational dictionaries upon which administrative law judges hearing social security disability cases rely in finding jobs which they think a person having the claimant's residual skills could perform. Although "keeping the wolf from the door is not an unworthy objective," as an eminent leader of the bar once remarked,[11] no one could rely upon the job of being an election officer as a rational means of accomplishing that objective.
 
 
 17
 Service as an election officer is ordinarily performed as a humble form of public-spirited service, inspired by partisan dedication and enthusiasm, rather than by non-political economic rapacity in quest of pecuniary gain. The pay is only $25 and the job exists only one day a year, like the ephemeral insects of summer or the moribund rose of which Ronsard the celebrated French poet sings:
 
 Mignonne, allons voir si la rose
 Qui ce matin avoit desclose
 
 18
 Sa robe de pourpre au Soleil,
 
 A point perdu cette vespree
 Les plis de sa robe pourpree
 
 19
 Et son teint au vostre pareil.
 
 
 20
 Las! voyez comme en peu d'espace,
 
 
 21
 Mignonne, elle a dessus la place,
 
 
 22
 Las! las! ses beautez laisse choir!
 
 
 23
 O vrayment marastre Nature,
 
 Puis qu'une telle fleur ne dure
 
 24
 Que du matin jusques au soir!
 
 
 25
 Donc, si vous me croyez, mignonne,
 
 Tandis que vostre age fleuronne
 
 26
 En sa plus verte nouveaute,
 
 Cueillez, cueillez vostre jeunesse:
 Comme a ceste fleur, la vieillesse
 Fera ternir vostre beaute[12]
 
 27
 This Circuit held in Harris v. Conradi, 675 F.2d 1212, 1215 (11th Cir.1982), that Alabama law does not require the appointment of equal numbers of officials from each party on election boards.[13]
 
 
 28
 If equality in numbers is not required (either in the composition of individual boards or in the total number of officials appointed in the County to serve at a particular election), and if consideration of party affiliation is legitimate and necessary in the composition of election boards in order to discourage dishonesty and fraud, it is difficult to see any merit in appellants' complaint regarding the November 2, 1982 election.
 
 
 29
 If ever there was occasion for invoking the rule de minimis, it should be operative in the case at bar. No election board without a Republican election officer has been identified. The State's policy of bipartisanship has been followed. There was substantial representation of Republicans on each election board.
 
 
 30
 The total Republican representation on the election boards throughout the County was more generous than would have been the case if proportionality to party strength as shown by the vote at primaries and general elections had been the desideratum.
 
 
 31
 We therefore conclude that the substantial representation of Republicans resulting from the appointments made for the November 2, 1982 election fully satisfied the bipartisan requirements of Alabama law as well as the requirements imposed by federal constitutional standards, and that no federal constitutional rights of appellants were infringed.
 
 
 32
 The judgment of the District Court is therefore
 
 
 33
 AFFIRMED.
 
 
 34
 TJOFLAT, Circuit Judge, specially concurring in which KRAVITCH, Circuit Judge, joins:
 
 
 35
 The State of Alabama has a legitimate interest in the bipartisan composition of its election boards. Party affiliation is therefore an "appropriate requirement for the effective performance of the public office involved." See Branti v. Finkel, 445 U.S. 507, 518, 100 S.Ct. 1287, 1295, 63 L.Ed.2d 574 (1980). Appellants' claim thus amounts to an argument that the first and fourteenth amendments mandate greater Republican party representation on Alabama election boards than was accorded in this instance. The district court correctly concluded that the Constitution does not require an equal number of Republican and Democratic party members be appointed as election officials, see Harris v. Conradi, 675 F.2d 1212, 1217 (11th Cir.1982), and that Republican representation on election boards approximately equal to their proportion in the population is consonant with the Constitution. Accordingly, I join in the court's decision to affirm the judgment of the district court.
 
 
 
 *
 Honorable Edward Dumbauld, Senior U.S. District Judge for the Western District of Pennsylvania, sitting by designation
 
 
 [1]
 This colloquialism seems to have originated from Patrick Henry's jury speech on September 19, 1789, defending John Venable in an action of trover for conversion of two steers belonging to John Hook, a wealthy Scotchman suspected of Tory proclivities. Venable as commissary had taken the steers for use of the troops during the invasion of Virginia by Lord Cornwallis in 1781. Henry "painted the distresses of the American army ... marking the frozen ground over which they marched with the blood from their unshod feet." He depicted the subsequent surrender of Cornwallis at Yorktown and the reverberating shouts of victory echoing through the American ranks. "But hark! what notes of discord are these which disturb the general joy, and silence the acclamations of victory--they are the notes of John Hook, hoarsely bawling through the American camp, beef! beef! beef! " After a verdict for the defendant "Hook began to hear around him a cry more terrible than that of beef; it was the cry of tar and feathers: from the application of which it is said that nothing saved him but a precipitate flight and the speed of his horse." William Wirt Henry, Patrick Henry: Life, Correspondence and Speeches (1891) II, 482-85
 
 
 [2]
 Appellants' grievance, supposedly of constitutional dimension, was brought under 42 U.S.C. 1983 which provides:
 Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 
 
 [3]
 "The United States shall guarantee to every State in this Union a Republican form of Government." U.S. Constitution, Art. IV, sec. 4
 
 
 [4]
 "Congress shall make no law ... abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the Government for redress of grievances." U.S. Constitution, First Amendment
 
 
 [5]
 "nor shall any State ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Constitution, Fourteenth Amendment, sec. 1
 
 
 [6]
 Justice Stewart's opinion in Elrod was joined in by Justice Blackmun. The other members of the Court were equally divided. Justice Brennan's opinion had the assent of two other Justices, White and Marshall. Justice Powell's dissent was joined in by Chief Justice Burger and Justice Rehnquist. In Branti, Justice Stewart dissented, as did Justices Powell and Rehnquist. The opinion of Justice Stevens (who had not participated in Elrod ) gained the assent of the Chief Justice and Justice Blackmun, as well as of Justices Brennan, White and Marshall
 
 
 [7]
 In Mobile County Republican Executive Committee v. Mandeville 363 So.2d 754, 758 (1978), the Supreme Court of Alabama held that the purpose of the Alabama legislation regarding appointment of election officials "is to insure that elections be honestly conducted." It was also held in that case that the law does not require that election officers be appointed equally from both parties or in proportion to their voting strength
 
 
 [8]
 Marvin E. Frankel, "The Search for Truth: An Umpireal View," 123 U. of Pa.L.R. (May, 1975) 1031, 1036, 1048, 1052-56; Zechariah Chafee, "Does Freedom of Speech Really Tend to Produce Truth?" Chapter IV of The Blessings of Liberty (1956) 102-115; Arthur R. Miller, "The Adversary System: Dinosaur or Phoenix," 69 Minn.L.R. (October, 1984) 1, 20, 55
 
 
 [9]
 Constitutional recognition of the adversary process is likewise found in the Sixth Amendment rights of a party "to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; [and] to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence." U.S. Constitution, Sixth Amendment. See also Greene v. McElroy, 360 U.S. 474, 496, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959); and Pointer v. Texas, 380 U.S. 400, 404-405, 85 S.Ct. 1065, 1068-1069, 13 L.Ed.2d 923 (1965). See also New York Times Co. v. Sullivan, 376 U.S. 254, 269-76, 84 S.Ct. 710, 720-23, 11 L.Ed.2d 686 (1964) [robust unfettered political controversy essential to popular government]
 
 
 [10]
 According to the editorial apparatus in the 1975 edition of the Alabama Code, section 17-9-23 was enacted in 1939, whereas Sec. 17-6-1, Sec. 17-6-6, and Sec. 17-6-9 are derived from laws dating back to 1876, 1896 and 1852 respectively. Section 17-9-41, providing that "The provisions of all other laws relating to the conduct of elections shall, so far as practicable, apply to the conduct of elections where voting machines are used, unless herein otherwise provided" would not affect the result, since the 1939 act specifically fixes the number of election officers as four
 
 
 [11]
 "From my observation of law students and young lawyers for almost half a century, I believe most of them are drawn to our profession out of motives beyond its being a mere means to a livelihood, though keeping the wolf from the door is not an unworthy objective." A Visit with Whitney North Seymour (Eleanor M. Fox, ed. 1984) 33
 
 
 [12]
 D.B. Wyndham Lewis, Ronsard (1944) 20. For an English version in verse by Andrew Lang, see ibid, 20-21. In prose: "Darling, let us go to see if the rose which this morning had unfolded her robe of purple to the sun has not lost this evening the folds of her purple robe and her color like yours. Alas, darling, see how in a little time she has let fall her beauties upon that place. O truly cruel Nature, that such a flower lasts only from morn till eve! Then, if you believe me, darling, while your age flourishes in its freshest newness, pluck, pluck your youth: old age will tarnish your beauty like that of this flower." Or perhaps the Republicans are moved by the muse of Robert Herrick:
 "Gather ye rosebuds while ye may,
 Old Time is still a-flying:
 And this same flower that smiles to-day
 To-morrow will be dying."
 The Oxford Book of English Verse (1919) 266.
 
 
 [13]
 The court cited the Alabama Supreme Court case referred to in note 7, supra