953 F.2d 1266
 Tina M. BURTON, a citizen and taxpayer of the State of
Georgia; Georgia Citizens Action and Common Cause/Georgia,
organizations interested in the rights of victims and
truthfulness in government, Plaintiffs-Appellees,
v.
STATE OF GEORGIA; Michael J. Bowers, Attorney General;
Zell Miller, Governor; and Max Cleland, Secretary
of State, Defendants-Appellants.
Tina M. BURTON, a citizen and taxpayer of the State of
Georgia; Georgia Citizens Action and Common Cause/Georgia,
organizations interested in the rights of victims and
truthfulness in government, Plaintiffs-Appellants,
v.
STATE OF GEORGIA; Michael J. Bowers, Attorney General;
Zell Miller, Governor; and Max Cleland, Secretary
of State, Defendants-Appellees.
 Nos. 90-9021, 91-8245.
 United States Court of Appeals,
Eleventh Circuit.
 Jan. 30, 1992.
 
 Michael E. Hobbs, Charles M. Richards and George P. Shingler, Asst. Attys. Gen., Atlanta, Ga., for State of Ga., Michael Bowers, Atty. Gen., Zell Miller, Governor and Max Cleland, Secretary of State.
 Kenneth S. Canfield and Ralph I. Knowles, Doffermyre, Shields & Canfield, Atlanta, Ga., for Tina M. Burton, et al.
 Appeals from the United States District Court for the Northern District of Georgia.
 Before EDMONDSON, Circuit Judge, JOHNSON* and SMITH**, Senior Circuit Judges.
 EDMONDSON, Circuit Judge:
 
 
 1
 In this case we must decide whether the ballot language selected by Georgia's legislature for a proposed amendment to the state's constitution was so misleading to voters as to justify a federal court's invalidating the outcome of a state referendum on the amendment. We conclude that the ballot language was not misleading and affirm the district court's denial of relief.
 
 I.
 
 2
 The proposed amendment, which is set out in full in an appendix to this opinion, affects the ability of citizens to sue the state of Georgia, its departments, agencies, officers, and employees. A series of state court decisions had, since 1987, undercut the sovereign and official immunity from suit. The legislature's reaction to these judicial opinions was an amendment to the Georgia Constitution that would, among other things, allow the state legislature to create a state court of claims and eliminate at least temporarily the state's pre-existing policy of waiving sovereign immunity for claims covered by liability insurance.
 
 
 3
 Georgia's voters must approve amendments to the state constitution. As part of the pertinent legislation on the proposed amendment, called "Amendment One" by the parties because of its placement on the referendum ballot, the legislature specified this language for inclusion on the ballot:
 
 
 4
 Shall the Constitution be amended to provide that the General Assembly may authorize lawsuits against the state and its departments, agencies, officers, and employees and to provide how public officers and employees may and may not be held liable in court?
 
 
 5
 The referendum on Amendment One passed, with 53.11% voting in favor, and 46.89% voting against.
 
 
 6
 Plaintiffs brought this action under 42 U.S.C. § 1983, claiming the ballot language so misled voters that it violated their right to vote, guaranteed by the federal constitution's Due Process Clause. Plaintiffs argue that the language adopted by the General Assembly to identify the proposed amendment on the referendum ballot misled voters into believing that the amendment would make it easier to sue the state; plaintiffs contend the amendment would actually make suing the state significantly more difficult by broadening sovereign and official immunity.II.
 
 
 7
 The Supreme Court has held that, "[u]ndeniably, the Constitution of the United States protects the rights of all qualified citizens to vote, in state as well as federal elections." Reynolds v. Sims, 377 U.S. 533, 554, 84 S.Ct. 1362, 1377-78, 12 L.Ed.2d 506 (1964). "And the right of suffrage can be denied by the debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." Id. at 555, 84 S.Ct. at 1378.
 
 
 8
 Principles of federalism limit the power of federal courts to intervene in state elections, however. The Constitution leaves "the conduct of state elections to the states." Gamza v. Aguirre, 619 F.2d 449, 453 (5th Cir.1980). We have cautioned before against excessive entanglement of federal courts in state elections. "The very nature of the federal union contemplates separate functions for the states. If every state election irregularity were considered a federal constitutional deprivation, federal courts would adjudicate every state election dispute...." Id. The power of the federal courts to throw out the results of a state election is "[d]rastic, if not staggering ... and therefore a form of relief to be guardedly exercised." Bell v. Southwell, 376 F.2d 659, 662 (5th Cir.1967).
 
 
 9
 Because the Constitution largely contemplates state regulation of state elections, we have long recognized that not every state election dispute implicates federal constitutional rights. "Only in extraordinary circumstances will a challenge to a state election rise to the level of a constitutional deprivation." Curry v. Baker, 802 F.2d 1302, 1314 (11th Cir.1986). In most cases, irregularities in state elections are properly addressed at the state level, whether through state courts or review by state election officials. See Griffin v. Burns, 570 F.2d 1065, 1078 (1st Cir.1978) ("[D]ue process is implicated where the entire election process--including as part thereof the state's administrative and judicial corrective process--fails on its face to afford fundamental fairness."). The state's political process affords another avenue for redress of grievances, as voters may demonstrate at the polls their displeasure with those officials responsible for election irregularities, and citizens may lobby for changes in the election process itself.[1]
 
 
 10
 When considering whether federal due process rights have been impinged in a state election, this circuit has identified a significant distinction "between state laws and patterns of state action that systematically deny equality in voting, and episodic events that, despite non-discriminatory laws, may result in the dilution of an individual's vote." Curry, 802 F.2d at 1314 (quoting Gamza, 619 F.2d at 453). While "federal courts closely scrutinize state laws whose very design infringes on the rights of voters, ... [those] 'isolated events that adversely affect individuals are not presumed to be a' constitutional violation." Id. (quoting Gamza, 619 F.2d at 453).
 
 
 11
 Plaintiffs do not allege systematically discriminatory election procedures, but only dilution of their right to vote on this one occasion. As a result, they may prevail only "if the election process itself reaches the point of patent and fundamental unfairness.... Such a situation must go well beyond the ordinary dispute over the counting and marking of ballots." Id. at 1315 (emphasis added) (quoting Duncan v. Poythress, 657 F.2d 691, 703 (5th Cir. Unit B 1981)). And, as we noted in Curry, "there are no bright lines distinguishing 'patent and fundamental unfairness' from 'garden variety election disputes.' " Id. (citing Welch v. McKenzie, 765 F.2d 1311, 1317 (5th Cir.1985)).
 
 
 12
 We are aware of no cases in which a federal court has invalidated a state election on grounds like those asserted by plaintiffs. For such extraordinary relief to be justified, it must be demonstrated that the state's choice of ballot language so upset the evenhandedness of the referendum that it worked a "patent and fundamental unfairness" on the voters. Such an exceptional case can arise, in the context of a case such as this one, only when the ballot language is so misleading that voters cannot recognize the subject of the amendment at issue.[2] In such a case, the voters would be deceived, in a concrete and fundamental way, about " 'what they are voting for or against.' " Burger v. Judge, 364 F.Supp. 504, 511 n. 16 (D.Mont.1973) (upholding state referendum on constitutional amendment against due process challenge to ballot language) (quoting Kohler v. Tugwell, 292 F.Supp. 978, 982 (E.D.La.1968)).[3]
 
 
 13
 As long as citizens are afforded reasonable opportunity to examine the full text of the proposed amendment,[4] broad-gauged unfairness is avoided if the ballot language identifies for the voter the amendment to be voted upon. Therefore, substantive due process requires no more than that the voter not be deceived about what amendment is at issue.
 
 
 14
 The question is complicated somewhat when a state chooses to identify an amendment on a ballot by briefly summarizing the amendment's text--the approach adopted by the state of Georgia here. The same analysis applies, however. When the ballot language purports to identify the proposed amendment by briefly summarizing its text, then substantive due process is satisfied--and the election is not "patently and fundamentally unfair"--so long as the summary does not so plainly mislead voters about the text of the amendment that "they do not know what they are voting for or against"; that is, they do not know which or what amendment is before them.
 
 III.
 
 15
 We conclude that the ballot language adopted by the Georgia General Assembly briefly summarizing the text of Amendment One passes this deferential due process test. The ballot language does not mislead about the actual text of the amendment. In fact, the ballot language itself roughly tracks the text of Amendment One. The first clause of the ballot language reads, "Shall the Constitution be amended to provide that the General Assembly may authorize lawsuits against the state and its departments, agencies, officers, and employees ...?" In a similar way, Amendment One speaks in terms of empowering the General Assembly to waive the state's immunity from suit:
 
 
 16
 (a) The General Assembly may waive the state's sovereign immunity from suit by enacting a State Tort Claims Act....
 
 
 17
 (d) Except as specifically provided by the General Assembly in a State Tort Claims Act, all officers and employees of the state or its departments and agencies may be subject to suit
 
 
 18
 . . . . .
 
 
 19
 (e) ... The sovereign immunity of the state and its departments and agencies can only be waived by an Act of the General Assembly....
 
 
 20
 The ballot language concludes that Amendment One "provides how public officers and employees may and may not be held liable in court?" Subsection (d) of Amendment One does precisely that, outlining under what circumstances official immunity from suit applies.
 
 
 21
 Plaintiffs complain that the ballot language misleads voters about the effect Amendment One will likely have on the ability of citizens to sue the state of Georgia. We cannot accept the proposition that substantive due process imposes an affirmative obligation on states to explain--some might say speculate--in ballot language the potential legal effect of proposed amendments to the state constitution. Such future effects are almost impossible to predict with accuracy, and the constitutionality of a state referendum ought not to be contingent on events that may occur long after the referendum, such as, judicial decisions construing or applying the amendment at issue.
 
 
 22
 We see no "patent and fundamental unfairness" inherent in the state's failure, if any, to convey the legal effect of Amendment One--that is, to explain the current state of Georgia immunity law and the changes that Amendment One would likely bring about if adopted.[5] The ballot language is intended only to identify for the voters the amendment to be passed upon; voters must inspect the text of the amendment itself to determine, for themselves, the legal effect of its passage. In this respect, the language identifying proposed constitutional amendments serves much the same role on the ballot as a candidate's name in an election for political office. In general, voters presumably do not select officials on the basis of their names, but on the policies and programs those names represent.[6]
 
 
 23
 Though plaintiffs complain that the ballot language purports to explain the legal significance of Amendment One, we disagree. The ballot seems to us to do no more than summarize the text of the amendment itself: the entire content of the ballot language can be explained by reference to the actual text of the amendment. Because the nature of an amendment is to make a change in the law, all or almost all summaries of an amendment's text will suggest some change will be effected by its passage.
 
 
 24
 Were we to adopt plaintiffs' contention, however, every amendment summary would be subject to federal court consideration of whether the change in the law implied by the ballot language is a "fair" representation of the amendment's actual import--whatever that may be.[7] So long as the election process is not so impaired that it is "patently and fundamentally unfair," substantive due process is satisfied. It is not for federal courts to decide whether the state General Assembly could have selected some other language, or some other approach, that might have better informed the voters of Amendment One's content. "[I]t is, by now, absolutely clear that the Due Process Clause does not empower the judiciary 'to sit as a superlegislature to weigh the wisdom of legislation.' " Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 124, 98 S.Ct. 2207, 2213, 57 L.Ed.2d 91 (1978) (quoting Ferguson v. Skrupa, 372 U.S. 726, 731, 83 S.Ct. 1028, 1031, 10 L.Ed.2d 93 (1963)). We feel confident that a ballot form that provided, "Shall the state constitution be amended to provide as follows:" and then set out in full the text of a proposed amendment would satisfy due process, and yet even the text of the amendment itself might imply a change in the law potentially misleading to voters who are unfamiliar with the existing law being altered by the amendment.
 
 
 25
 At trial, plaintiffs offered expert testimony and some statistical support for the proposition that many voters may have relied entirely on the ballot language in deciding how to vote on Amendment One. Accepting this as true, we cannot say that the entire election was infected with "patent and fundamental unfairness;" the state properly relied on its citizenry to inform itself about the current state of Georgia immunity law and the likely effects of Amendment One's passage.[8] As the court in Kohler v. Tugwell, 292 F.Supp. 978 (E.D.La.1968) put it,
 
 
 26
 The issue before us is not a proposition for grammarians. If the average voter had to decide what he was voting on from the ballot alone, he might well have read it as the plaintiffs do. But he did not have to decide from this summary. He could look at the amendment itself.
 
 
 27
 Id. at 981.
 
 IV.
 
 28
 Because we conclude that the challenged state referendum satisfies the requirements of due process, we AFFIRM the district court's judgment denying relief.[9]
 
 APPENDIX A
 
 29
 The relevant provisions of Amendment One are laid out in full below. Subparagraphs (a) and (d) are entirely new; subparagraph (b) is unchanged; subparagraph (c) concerns claims for breach of contract; and subparagraph (e) is essentially unchanged.
 
 
 30
 Section 1. Article I, Section II of the Constitution is amended by deleting the existing Paragraph IX in its entirety and substituting therefor the following:
 
 
 31
 Paragraph IX. Sovereign immunity and its waiver thereof; claims against the state and its departments, agencies, officers, and employees.
 
 
 32
 (a) The General Assembly may waive the state's sovereign immunity from suit by enacting a State Tort Claims Act, in which the General Assembly may provide by law for procedures for the making, handling, and disposition of actions or claims against the state and its departments, agencies, officers, and employees, upon such terms and subject to such conditions and limitations as the General Assembly may provide.
 
 
 33
 (b) The General Assembly may also provide by law for the processing and disposition of claims against the state which do not exceed such maximum amount as provided therein....
 
 
 34
 (d) Except as specifically provided by the General Assembly in a State Tort Claims Act, all officers and employees of the state or its departments and agencies may be subject to suit and may be liable for injuries and damages caused by negligent performance of, or negligent failure to perform, their ministerial functions and may be liable for injuries and damages if they act with actual malice or with actual intent to cause injury in the performance of their official functions. Except as provided in this subparagraph, officers and employees of the state or its departments and agencies shall not be subject to suit or liability, and no judgment shall be entered against them, for the performance or nonperformance of their official functions. The provisions of this subparagraph shall not be waived.
 
 
 35
 (e) Except as specifically provided in this Paragraph, sovereign immunity extends to the state and all of its departments and agencies. The sovereign immunity of the state and its departments and agencies can only be waived by an Act of the General Assembly which specifically provides that sovereign immunity is thereby waived and the extent of such waiver.
 
 
 36
 1990 Ga.Laws 2435-37.
 
 
 37
 JOHNSON, Senior Circuit Judge, concurring specially:
 
 
 38
 Although I concur in the result reached by the majority of the panel, I write separately to note my disagreement with the majority's apparent holding that a ballot cannot be misleading as a matter of law if it adequately identifies the particular proposed amendment to be voted on, even if the ballot language affirmatively misrepresents the effect of the proposed amendment. Judge Edmondson's opinion cites Burger v. Judge, 364 F.Supp. 504, 511 n. 16 (D.Mont.), aff'd, 414 U.S. 1058, 94 S.Ct. 563, 38 L.Ed.2d 465 (1973), and Kohler v. Tugwell, 292 F.Supp. 978, 982 (E.D.La.1968), aff'd, 393 U.S. 531, 89 S.Ct. 879, 21 L.Ed.2d 755 (1969), for this proposition. Although I agree that these cases are relevant to the case at bar,[1] neither Burger nor Kohler involved a situation where the ballot proposal was rather simple, yet the ballot language affirmatively misrepresented that effect. In Burger, the dispute was whether the ballot misled voters as to the mechanics of the election, 364 F.Supp. at 508, and the Kohler case involved a very complex proposal which the court found could not possibly be adequately described on the ballot, 292 F.Supp. at 980.
 
 
 39
 In the case at bar, the ballot language incorrectly states that Amendment One would change the pre-Amendment One Constitution to (1) allow the General Assembly to authorize suits against the State and its officers, and (2) prescribe the circumstances in which officials may be held liable. Although Amendment One includes language related to these two proposals, the ballot text infers that the pre-Amendment One Constitution did not allow the General Assembly to waive sovereign and official immunity and did not prescribe the circumstances in which officials may be held liable. In fact, the pre-Amendment One Constitution, as interpreted by the Georgia courts, provided that (1) no sovereign immunity existed for contract actions, Ga. Const. Art. I, § 2, p 9 (1983); (2) the State waived sovereign immunity for torts if the State had insured itself against the suit or if the General Assembly had expressly waived it, id.; and (3) the State waived sovereign and official immunity for torts if either the State or the official had purchased insurance for suits against the official, Martin v. Georgia Dept. of Public Safety, 257 Ga. 300, 357 S.E.2d 569, 572 (1987), cert. denied, 484 U.S. 998, 108 S.Ct. 685, 98 L.Ed.2d 638 (1988). Under Georgia common law, uninsured officials were immune from liability for discretionary acts unless done with actual malice and ministerial acts unless done with negligence or malice. Hennessy v. Webb, 245 Ga. 329, 264 S.E.2d 878, 880 (1980).[2]
 
 
 40
 Amendment One, therefore, alters the current Constitution by (1) removing the constitutional insurance waiver of sovereign immunity for torts; thereby reinstating full sovereign immunity for torts subject to waiver by the General Assembly, (2) deleting the constitutional insurance waiver of official immunity, and (3) establishing a floor of official immunity by providing that the General Assembly may not make officials liable for discretionary acts taken with a mental state less culpable than malice or for ministerial acts taken with a mental state less culpable than negligence.
 
 
 41
 Hence, although the ballot language indicated that Amendment One would establish (not preserve) in the General Assembly the power to waive sovereign and official immunity, Amendment One does not effect this purpose. Rather, Amendment One actually expands the General Assembly's power to impose sovereign and official immunity, and decreases the General Assembly's power to waive official immunity.
 
 
 42
 Initially, the State had no constitutional obligation to do any more than identify Amendment One as the subject of the election. Nevertheless, when a state undertakes to explain the effect of a ballot proposal, due process imposes an additional duty on that state not to deceive the voters. Georgia breached this duty in the case at bar. Therefore, I believe that the plaintiffs established that the ballot language was misleading as a matter of law.
 
 
 43
 I agree, however, with the majority that, in order to justify the radical step of federal court intervention in a state election, the plaintiffs must also show that the deception was material, i.e., that it affected the election. See Harris v. Conradi, 675 F.2d 1212, 1216 (11th Cir.1982) (unless plaintiff was deprived outright of an opportunity to vote, plaintiff must show state action "caused an impairment" of the right to vote). Because the majority finds that the ballot was not misleading as a matter of law, it does not reach the merits of whether the deception was material. I believe that the plaintiffs have failed to establish materiality because their evidence consisted chiefly of two voter surveys which asked the excessively simple question of whether voters thought, based on the ballot language, Amendment One would make it easier or harder to sue the State and its officials. No one could know the answer to this question because it requires a prediction of what the General Assembly will do with its newly-defined powers.[3] The plaintiffs should have gathered evidence regarding voters' perception of the effect Amendment One will have on the scope of the General Assembly's power to impose or waive sovereign and official immunity. This defect in the plaintiffs' evidence precludes, as a matter of law, a finding that the plaintiffs established materiality. I therefore concur in the affirmance of the district court's judgment.
 
 
 
 *
 See Rule 34-2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit
 
 
 **
 Honorable Edward S. Smith, Senior U.S. Circuit Judge for the Federal Circuit, sitting by designation
 
 
 [1]
 In fact, the political and judicial branches of the State of Georgia have addressed on several occasions the proper role to be played by the ballot language identifying proposed amendments to the state constitution. We think these state efforts are illustrative of the constitutionally preferred avenue for grievances about "unfairness" in state elections, and also provide a helpful context for pronouncements we might make about the "fairness" of the vote on Amendment One
 Before 1939, the state legislature possessed unrestricted statutory authority to adopt the ballot language to accompany proposed amendments to the Georgia Constitution. State judicial review was limited to the requirement that the ballot language be adequate to enable voters to identify on which amendment they were voting. See McLennan v. Aldredge, 223 Ga. 879, 159 S.E.2d 682, 685 (1968) (adjudicating challenge to amendment to constitution of 1877) ("It was within legislative discretion to adopt some formula by which the voter would express his assent or dissent to the proposed amendment.") (quoting Cooney v. Foote, 142 Ga. 647, 83 S.E. 537, 540 (1914)).
 In 1939, the General Assembly delegated to the governor the task of drafting ballot language sufficient to allow voters "to intelligently pass upon any such proposed amendment." See 1939 Ga.Laws 305. This scheme arguably required more than a mere identification of the amendment to be passed upon. Cf. Sears v. State, 232 Ga. 547, 208 S.E.2d 93, 99 (1974). But, the General Assembly repealed the law in 1962, returning the ballot-drafting process to its previous condition. See 1962 Ga.Laws 620.
 In a 1956 amendment to the state constitution, the following provision was adopted to govern referendums on proposed constitutional amendments: "The General Assembly, in the resolution, shall state the language to be used in submitting the proposed amendment or proposal for a new Constitution." Ga. Const. art. XIII, § 1, p 1. This constitutional provision places no limitations on the exercise of the state legislature's power to draft ballot language.
 The state supreme court has held that the 1956 amendment, together with the repeal of the 1939 law governing the drafting of ballot language, evinces legislative intent that "the ballot language ... show[ ] itself upon examination to be adequate to identify the amendment to be voted upon," whether or not the language by itself is "misleading or confusing." Sears, 208 S.E.2d at 100.
 
 
 [2]
 This determination whether the ballot language falls below the requirements of substantive due process is an issue of law. If the court concludes that the ballot language is misleading as a matter of law, then a factual inquiry might still be necessary to determine whether the deception was material. The district court concluded that materiality is properly measured by whether plaintiffs' proof survived an "outcome test," requiring plaintiffs to demonstrate "a strong statistical showing that deception of voters was the key to the outcome of the election." Plaintiffs argue, alternatively, that their statistical evidence supported such an inference, and even if it did not, "submission of a misleading question to the voters for ratification, in and of itself, undermines the right to vote and thus violates due process," requiring invalidation of the election. Because we conclude, infra, that the ballot language was not so plainly misleading as to violate substantive due process, we do not address whether the district court's outcome test is the proper method for determining whether the misleading nature of the ballot language was sufficiently material to justify invalidating the election
 
 
 [3]
 Both Burger and Kohler were summarily affirmed by the Supreme Court. Burger v. Judge, 414 U.S. 1058, 94 S.Ct. 563, 38 L.Ed.2d 465 (1973); Kohler v. Tugwell, 393 U.S. 531, 89 S.Ct. 879, 21 L.Ed.2d 755 (1969). We cite and quote these cases, however, for their persuasiveness, not because the quoted language might constitute binding authority
 
 
 [4]
 The parties have stipulated that before the referendum at issue in this case, the actual text of Amendment One was published in full (as required by law) and summarized in the legal organs for each of Georgia's counties for three consecutive weeks before the election. Copies of the amendment were on file in the office of every probate court and election superintendent. A press release (which is not said to have been misleading) was prepared by the secretary of state's office, and a supply of audiotapes containing the amendment's text was sent to all the public libraries in Georgia
 
 
 [5]
 The district court observed that because much of Amendment One simply delegates authority to the General Assembly, it is impossible to predict the ultimate impact on Georgia immunity law:
 [T]he long-term effect of Amendment One does not lead itself to simple dichotomous analysis. While the immediate effect of the amendment will be to make it 'harder' to sue the state by repealing the liability insurance waiver, passage of a Tort Claims Act may facilitate lawsuits against the state.
 
 
 [6]
 A Seventh Circuit case illustrates this point. In Smith v. Cherry, 489 F.2d 1098 (7th Cir.1973), the Seventh Circuit found a substantive due process violation where Illinois election officials ran a "sham candidate" with enough voter support to defeat a rival; after the election, the sham candidate resigned and the candidate supported by the officials was appointed to the position. In a practical sense, the ballot in Smith misidentified the candidate voted upon. In the same way, referendum ballot language impinges on substantive due process only when it misidentifies the subject of the balloting
 
 
 [7]
 As we noted earlier, the federal court challenge to a referendum might arise years after an election when some state judge or other public officer reads the amendment in a way many voters would not have expected
 
 
 [8]
 If a majority of Georgia's voters really do not like Amendment One, they can do something about it. Citizens disappointed over the legal effect of Amendment One have recourse within the state's political system to lobby with their elected representatives for a Tort Claims Act expanding their ability to sue the state, or they may lobby their elected representatives (or elect new candidates to replace uncooperative representatives) for an entirely new amendment to the state constitution governing sovereign and official immunity that would nullify Amendment One
 
 
 [9]
 In appeal no. 90-9021, the State appeals the district court's pre-election grant of a preliminary injunction temporarily prohibiting the State from certifying or announcing the results of the referendum on Amendment One. We stayed consideration of the State's appeal until the district court awarded final judgment. We now dismiss the State's appeal to the preliminary injunction because the district court's denial of permanent relief rendered that earlier ruling moot. Once a final judgment is rendered, the appeal is properly taken from the final judgment, not the preliminary injunction. Cf. Securities & Exchange Comm'n v. First Fin. Group of Texas, 645 F.2d 429, 433 (5th Cir. Unit A, May 20, 1981). In Bonner v. Prichard, 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as precedent all decisions of the former Fifth Circuit Court of Appeals decided prior to October 1, 1981
 
 
 [1]
 Indeed, because they were summarily affirmed by the Supreme Court, these cases represent binding precedent for "the most narrow plausible rationale for the summary decision." Hardwick v. Bowers, 760 F.2d 1202, 1208 (11th Cir.1985); rev'd on other grounds, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986). For whatever reason, Judge Edmondson's opinion fails to note this
 
 
 [2]
 This common law immunity was presumably waivable by the General Assembly. See Hennessy, 264 S.E.2d at 879
 
 
 [3]
 If the General Assembly desired to make it easier to sue the State and its officials, it could, pursuant to Amendment One, waive sovereign immunity entirely and official immunity only to the extent it was waived prior to Amendment One. However, the General Assembly could not pass an insurance waiver of official immunity like the one that existed before Amendment One. If, on the other hand, the General Assembly wished to make it more difficult to sue the State and its officials, it could, under Amendment One, preserve full sovereign immunity and enact full official immunity. Hence, after Amendment One, it could become easier or harder to sue the State, but it will definitely be more difficult to sue officials