OPINION OF THE COURT
Patrick J. McGrath, J.
Plaintiffs bring this action seeking to declare unconstitutional New York’s “tax cap” legislation as it applies to public school districts. Defendants move to dismiss the complaint, and plaintiffs have submitted a reply. Various groups moved for, and were granted, leave to file amicus curiae briefs. While the briefs have been beneficial to determination of the issues, the court agrees with defendants that consideration will be limited to the issues raised in the complaint and argued by the parties to the lawsuit.
Education Law § 2023-a was enacted as part of chapter 97 of the Laws of 2011. In pertinent part, that chapter amended the Education Law by adding section 2023-a, and the General Municipal Law by adding section 3-c. Under these statutes, governmental entities seeking to levy taxes in excess of the allowable tax levy limit must obtain the approval of at least 60% of a local government’s governing body or, in the case of a school district, the district voters. When a school district seeks to enact a budget which exceeds the statute’s threshold, the ballot presenting the budget must bear the following statement: “Adoption of this budget requires a tax levy increase of_which exceeds the statutory tax levy increase limit of [_.] for this school fiscal year and therefore exceeds the state tax cap and must be approved by sixty percent of the qualified voters present and voting.” (Education Law § 2023-a [6] [b].) There is no similar provision in General Municipal Law § 3-c.
*254 This action is brought by a union representing public and private sector employees and retirees, including persons employed by, or retired from, local public school districts, colleges and universities, hospitals, libraries, municipal governments, and centers for the developmentally disabled. The majority of the union’s members reside in New York, are qualified to vote in their school district elections, and, in some cases, have children who attend New York’s public schools. The union is joined as the plaintiff in this action by eight individuals who are variously state residents and taxpayers, parents of children who attend public schools, and voters in their local school elections. Two of the individuals (Pearl and Strong) also sue on behalf of their children who are public school students, and four (Avery, Ehlers, Pearl, Pickford) are teachers in state public schools. All eight individual plaintiffs claim to have voted in favor of local school budgets that included a tax levy in excess of the tax levy limit and failed to garner the 60% vote necessary for passage.
Plaintiffs attack Education Law § 2023-a as violating the Education Article (art XI) of the New York State Constitution (first and second causes of action), the Equal Protection (first, third, fourth and sixth causes of action) and Due Process (first and third causes of action) Clauses of the United States and New York Constitutions, the right to vote under the State and Federal Constitutions (fifth cause of action), and the right to free expression under the Federal and New York Constitutions (seventh cause of action).
For relief, plaintiffs seek: (1) a declaration that Education Law § 2023-a is null and void as it violates the New York and United States Constitutions; (2) a permanent injunction against continuation of the tax levy threshold as it applies to school districts; (3) an award of costs, disbursements, and attorneys’ fees to plaintiffs; and (4) such different relief which the court finds appropriate. Ultimately, plaintiffs seek to have Education Law § 2023-a declared unconstitutional.
The summons and complaint were served on or about February 20, 2013. By stipulation of counsel, the time for the defendants to respond was extended to April 1, 2013. On April 1, 2013, the defendants made a motion to dismiss the complaint. By stipulation of counsel, the plaintiffs’ time to respond to that motion was extended to June 7, 2013. It was later agreed that the plaintiffs could serve an amended complaint by July 5, 2013 and that the defendants had until August 5, 2013 (since *255 extended to Aug. 12) to respond to the amended complaint. Plaintiffs’ amended complaint was served on July 5, 2013. Defendants then served a motion to dismiss the first amended complaint which, after full submission, was argued before the Supreme Court (O’Connor, J.) on December 19, 2013. After Acting Justice O’Connor’s recusal, the matter was transferred to Justice Devine. The parties appeared for a conference before Justice Devine on April 14, 2014 for “re-arguement” on the motion to dismiss, wherein plaintiffs advised that they wanted to serve a second amended complaint to challenge the recently enacted Education Law § 2023-b (the tax freeze). Defendants declined to consent. Judge Devine postponed reargument until after the motion to amend was served and opposed. On April 15, 2014, Justice Devine was appointed to the Appellate Division, Third Department. The matter was assigned to Acting Justice Platkin, who recused himself, and the matter was then transferred to this court. On June 3, 2014, the plaintiffs served a motion to file a second amended complaint, which is now fully submitted.
Plaintiffs ask the court to rule on the motion to amend before deciding the instant motion to dismiss. Plaintiffs argue that the proposed amendments cause no prejudice, as the tax cap and tax freeze are intertwined and, further, that consideration of their interrelationship in a single action promotes judicial efficiency. Defendants argue that the motion to dismiss is fully briefed and argued, and has been pending since December 19, 2013, and that the motion should be ruled on first before consideration is given to the plaintiffs’ motion to amend. Defendants note that if they are successful on the motion to dismiss, the plaintiffs would still be able to present their challenge to Education Law § 2023-b in a new proceeding. If not, plaintiffs could then amend to include their challenges to section 2023-b.
The motion to dismiss, which argues that the complaint fails to state a cause of action pursuant to CPLR 3211 (a) (7), has been pending for over a year. Four different judges have been assigned to the matter, and little has been accomplished by way of judicial decree. A decision on the current motion to dismiss will narrow the issues. Further, as the tax cap and tax freeze are interrelated, the instant decision could inform how the parties seek to proceed, as it will constitute the law of the case. Therefore, the court will render a decision on the motion to dismiss.
*256 Standing
Before addressing the merits, the court must first determine defendants’ assertion that none of the listed plaintiffs have standing to maintain this action (with the exception of the fifth cause of action, which alleges that the tax cap has the effect of diluting their voting power). Plaintiffs argue that if standing is denied, an important constitutional issue would be effectively insulated from judicial review. Applying the principles set forth by the Court of Appeals in Boryszewski v Brydges (37 NY2d 361 [1975]), this court holds that the concerns of the plaintiffs over the impact of the legislation on them were sufficient to gain them standing to challenge the constitutionality of the statute. (Id.; see also Prodell v State of New York, 222 AD2d 178 [3d Dept 1996]; Board of Educ., Shoreham-Wading Riv. Cent. School Dist. v State of New York, 111 AD2d 505, 507 [3d Dept 1985] [the taxpayer’s “concerns over the impact of the . . . legislation on them are sufficient to gain them standing to challenge the constitutionality of the . . . legislation”].) Additionally, the court finds that if standing were denied, “an important constitutional issue would be effectively insulated from judicial review.” (Saratoga County Chamber of Commerce v Pataki, 100 NY2d 801, 814 [2003]; Boryszewski v Brydges, 37 NY2d 361 [1975]; Matter of Ricket v Mahan, 97 AD3d 1062 [3d Dept 2012].) The motion to dismiss for lack of standing is denied.
Motion to Dismiss Complaint against the Governor, Comptroller and Education Commissioner
Plaintiffs claim that the above named defendants are proper because the complaint seeks relief under 42 USC § 1983, however, even when liberally construed, the complaint fails to include allegations of personal involvement by any of the individual defendants. Because personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983, the complaint is dismissed against the individual defendants. (See generally Shelton v New York State Liq. Auth., 61 AD3d 1145 [3d Dept 2009].)
Standard of Review—CPLR 3211 (a) (7)
On a defendant’s motion to dismiss for failure to state a cause of action, a plaintiffs claim is liberally construed and all facts asserted therein, as well as its submissions in opposition to defendant’s motion, are accepted as true. (511 W. 232nd Owners Corp. v Jennifer Realty Co., 98 NY2d 144, 152 [2002]; see also Nonnon v City of New York, 9 NY3d 825, 827 [2007]; State of *257 New York v Shaw Contract Flooring Servs., Inc., 49 AD3d 1078, 1079 [3d Dept 2008].) Where, as here, a motion is premised upon a plaintiffs failure to state a claim, the dispositive inquiry is whether the plaintiff has a cause of action, and not whether one has been stated, i.e., “whether the facts as alleged fit within any cognizable legal theory.” (Leon v Martinez, 84 NY2d 83, 87-88 [1994].)
Plaintiffs’ Burden of Proof
Since “[legislative enactments enjoy a strong presumption of constitutionality . . . parties challenging a duly enacted statute face the initial burden of demonstrating the statute’s invalidity ‘beyond a reasonable doubt.’ ” (LaValle v Hayden, 98 NY2d 155, 161 [2002] [citations omitted]; McKinney’s Cons Laws of NY, Book 1, Statutes § 150 at 320-321.) “Moreover, courts must avoid, if possible, interpreting a presumptively valid statute in a way that will needlessly render it unconstitutional.” (Id.) “[O]nly as a last resort will courts strike down legislative enactments on the ground of unconstitutionality.” (Matter of Schultz Mgt. v Board of Stds. & Appeals of City of N.Y., 103 AD2d 687, 689 [1st Dept 1984], citing Sgaglione v Levitt, 37 NY2d 507, 515 [1975].) “Thus, where an act is susceptible of two constructions, one of which will make it constitutional and the other unconstitutional, the former will be adopted.” (McKinney’s Cons Laws of NY, Book 1, Statutes § 150, Comment at 324.)
Plaintiffs present a facial challenge to the constitutionality of Education Law § 2023-a. “A plaintiff can only succeed in a facial challenge by ‘establish[ing] that no set of circumstances exists under which the Act would be valid’, i.e., that the law is unconstitutional in all of its applications.” (Washington State Grange v Washington State Republican Party, 552 US 442, 449 [2008], quoting United States v Salerno, 481 US 739, 745 [1987].) New York’s rule is similar. (Matter of Moran Towing Corp. v Urbach, 99 NY2d 443, 448 [2003]; Cohen v State of New York, 94 NY2d 1, 8 [1999]; Amazon.com, LLC v New York State Dept. of Taxation & Fin., 81 AD3d 183, 194 [1st Dept 2010].)
Binding Precedent
Several cases from the Court of Appeals dictate much of the outcome in this matter, and therefore, a review of the salient points of these cases will provide the framework for the court’s decision on the multiple constitutional questions raised in the complaint.
In Board of Educ., Levittown Union Free School Dist. v Nyquist (57 NY2d 27 [1982]), plaintiffs, who included “property- *258 poor” school districts, challenged the constitutionality of the state’s system of financing public schools by which funds raised by locally imposed taxes are augmented by allocations of state moneys in accordance with a variety of formulas and grants. Plaintiffs claimed that the system violated the Equal Protection Clauses of both the State and the Federal Constitutions and the Education Article of the State Constitution because it resulted in grossly disparate financial support and thus grossly disparate educational opportunities in the school districts, and further, that “property-rich” districts have an ability to raise greater local tax revenue enabling them to provide enriched educational programs beyond the fiscal ability of the “property-poor” districts. The Court dismissed the equal protection claims, noting that the same arguments were considered and rejected by the Supreme Court of the United States in San Antonio Independent School Dist. v Rodriguez (411 US 1 [1973]).
“Noting that the subject of public school finance involves decisions both with respect to the raising and disposition of public revenues and of persistent, complex, and difficult questions of educational policy areas appropriately within legislative determination[,] the [Supreme] [C]ourt held that rational basis, rather than strict scrutiny, was the proper standard against which to examine the Texas public school financing system there under review (which was described by the court as ‘comparable to the systems employed in virtually every other State’ [at pp 47-48]). Applying this standard, the court found in the Texas system a rational relationship to a legitimate State purpose—the permission and encouragement of participation in and control of public schools at the local district level.” (Levittown at 41.)
In terms of a state equal protection claim, the Court noted that its prior decision in Matter of Levy (38 NY2d 653 [1976]) was controlling, wherein the Court held that rational basis was the proper standard for review when the challenged State action implicated the right to free, public education. Further, under a rational basis test, the Court held that “there has not been such a showing, and that the justification offered by the State—the preservation and promotion of local control of education—is both a legitimate State interest and one to which the present financing system is reasonably related.” (Levittown at 44.) The Court noted that “[i]t is the willingness of the taxpayers of many districts to pay for and to provide enriched educational *259 services and facilities beyond what the basic per pupil expenditure figures will permit that creates differentials in services and facilities.” (Id. at 45.) Further, the Court noted that “[a]ny legislative attempt to make uniform and undeviating the educational opportunities offered by the several hundred local school districts . . . would inevitably work the demise of the local control of education available to students in individual districts.” (Id. at 45-46.)
With respect to the Education Article, the Court noted that the constitutional language made no reference to any requirement that the education to be made available be equal or substantially equivalent in every district. The Court noted that
“[t]he Legislature has made prescriptions (or in some instances provided means by which prescriptions may be made) with reference to the minimum number of days of school attendance, required courses, textbooks, qualifications of teachers and of certain nonteaching personnel, pupil transportation, and other matters. If what is made available by this system (which is what is to be maintained and supported) may properly be said to constitute an education, the constitutional mandate is satisfied.” (Id. at 48.)
The Court noted that plaintiffs did not claim that
“the educational facilities or services provided in the school districts that they represent fall below the State-wide minimum standard of educational quality and quantity fixed by the Board of Regents; their attack is directed at the existing disparities in financial resources which lead to educational unevenness above that minimum standard.” (Id. at 38.)
The Court found that the constitutional requirement of a “sound basic education” had been met, as the plaintiffs failed to establish any “gross and glaring inadequacy” “in consequence of the present school financing system.” (Id. at 48-49.)
The last statement left the door open for the challenge mounted in Campaign for Fiscal Equity v State of New York (86 NY2d 307 [1995]) (also referred to as CFE I), where plaintiffs argued that the state’s public school financing system did not provide the opportunity to obtain a proper education to students in New York City. The posture of CFE I was a CPLR 3211 (a) (7) motion to dismiss claims made pursuant to the Education Article, as well as the Equal Protection Clauses of the State and *260 Federal Constitutions. The Court noted that Levittown had set a “constitutional floor” with respect to educational adequacy, and that it “left room for a conclusion that a system which failed to provide for a sound basic education would violate the Education Article.” (Id. at 315, 316.) The Court held that a sound basic education
“should consist of the basic literacy, calculating, and verbal skills necessary to enable children to eventually function productively as civic participants capable of voting and serving on a jury. If the physical facilities and pedagogical services and resources made available under the present system are adequate to provide children with the opportunity to obtain these essential skills, the State will have satisfied its constitutional obligation.” (Id. at 316.)
Further, the Court held that
“[t]he State must assure that some essentials are provided. Children are entitled to minimally adequate physical facilities and classrooms which provide enough light, space, heat, and air to permit children to learn. Children should have access to minimally adequate instrumentalities of learning such as desks, chairs, pencils, and reasonably current textbooks. Children are also entitled to minimally adequate teaching of reasonably up-to-date basic curricula such as reading, writing, mathematics, science, and social studies, by sufficient personnel adequately trained to teach those subject areas.” (Id. at 317.)
The Court explained that evidence of whether students are receiving a sound basic education may include, in addition to proof about these essentials, facts showing the outcomes of the educational process, such as examination results. The Court denied the motion to dismiss because plaintiffs advanced “the very claim we specifically stated was not before us in Levittown, i.e., that minimally acceptable educational services and facilities are not being provided in plaintiffs’ school districts.” (Id. at 316.) The Court indicated that the plaintiffs would “have to establish a causal link between the present funding system and any proven failure to provide a sound basic education” to them. (Id. at 318.)
In addressing the equal protection claims, the Court held to its decision in Levittown, following San Antonio Independent School Dist. v Rodriguez, that education was not a fundamental *261 right under either the Federal or State Constitutions, and therefore, rational basis analysis was appropriate. The Court dismissed the equal protection claims because disparities in educational funding among school districts arising from the State’s financing scheme were rationally based upon and reasonably related to a legitimate State interest, the preservation and promotion of local control of education.
Two other cases also provide context to the plaintiffs’ claims, as both address the principle of “local control.” In Paynter v State of New York (100 NY2d 434 [2003]), plaintiffs brought a class action suit on behalf of students in the Rochester City School District, who alleged that certain state practices and policies have resulted in high concentrations of racial minorities and poverty in the school district, leading to abysmal student performance. The Court held that in order to state a cause of action under the Education Article, plaintiffs must allege, “first, that the State fails to provide them a sound basic education in that it provides deficient inputs—teaching, facilities and instrumentalities of learning—which lead to deficient outputs such as test results and graduation rates; and, second, that this failure is causally connected to the funding system.” (Id. at 440.) The Court dismissed the claim because plaintiffs did not allege that the substandard academic performance in their schools was caused by any deficiency in teaching, facilities or instrumentalities of learning, or any lack of funding. In dicta, the Court also noted that “[t]o embrace plaintiffs’ theory that the State is responsible for the demographic makeup of every school district, moreover, would be to subvert the important role of local control and participation in education.” (Id. at 443.) Citing Levittown, the Court noted that the Education Article
“enshrined in the Constitution a state-local partnership in which people with a community of interest and a tradition of acting together to govern themselves make the basic decisions on funding and operating their own schools. The premise of the Article is thus in part that a system of local school districts exists and will continue to do so because the residents of such districts have the right to participate in the governance of their own schools.”

(Id.)

The Court again dismissed an Education Article claim for failure to state a cause of action in New York Civ. Liberties Union v *262 State of New York (4 NY3d 175 [2005] [NYCLU]), specifically, the claim that students in 27 named schools outside of New York City were being denied the opportunity for a sound basic education. The Court noted that the gravamen of the complaint
“is not that more money is needed in these schools. Rather, it is that the State must undertake to figure out what is needed, which might well include money, and provide it. At bottom, plaintiffs’ claim is not premised on any alleged failure of the State to provide ‘resources’—financial or otherwise—but seeks to charge the State with the responsibility to determine the causes of the schools’ inadequacies and devise a plan to remedy them. An Education Article claim, however, requires a clear articulation of the asserted failings of the State, sufficient for the State to know what it will be expected to do should the plaintiffs prevail.” (Id. at 180.)
As relevant here, the Court also noted that the requested relief
“bypasses the districts and instead seeks to mandate that the State provide money or other resources directly to individual schools. Requiring the State to intervene on a school-by-school basis to determine each of the 27 named school’s sources of failure and devise a remedial plan would, as we explained in Paynter, subvert local control and violate the constitutional principle that districts make the basic decisions on funding and operating their own schools.” (Id. at 182.)
The Education Article Claims
The crux of the instant plaintiffs’ claim is that Education Law § 2023-a erodes local control of education spending, which has the effect of limiting educational opportunity everywhere, with a disproportionate impact on the poorest districts. This is another version of the argument rejected in Levittown, specifically, that “property-rich” districts can raise greater local tax revenue than “property-poor” districts, except now, plaintiffs inject the concept of local control into the argument. Plaintiffs rely heavily on Levittown, which recognized that the concept of “local control” is “enshrined” in the Education Article, and that “local control” constituted a “rational basis” to allow for unevenness of education opportunity. Paynter and NYCLU also denied the relief requested by the plaintiffs, in part, because it would allow the State to completely bypass the school district, and therefore, “subvert” the “constitutional principle” of local *263 control. While the Courts have recognized the importance of local control and sought to preserve it, the above case law provides a clear articulation of a cognizable cause of action under the Education Article. Since the constitutional floor is set at a “sound basic education” which can be disparate, plaintiffs’ allegation that the legislation will result in greater disparities does not give rise to a claim under the Education Article. Additionally, plaintiffs do not claim that the State has “fail[ed] in its obligation to provide minimally acceptable educational services.” (Paynter v State at 441.) Plaintiffs are not alleging any failure of the State to provide resources, financial or otherwise. Rather, the claim is one step removed from a true Education Article claim in that plaintiffs are arguing that the State has created a statute which makes it harder for a district to raise funds above a certain threshold. Since the decision to raise funds lies with the voters, the State itself is not withholding any resources that deprive students of a sound basic education. A complaint so framed cannot withstand a motion to dismiss.
The court also disagrees with the plaintiffs’ underlying assertion that the statute deprives a district from exercising local control. As pointed out by the defendants, a budget turned down by district voters is still an exercise of local control. “Local control” encompasses both favorable and unfavorable consideration of a school district’s budget, while plaintiffs appear to equate local control with budget approval. The vote itself connotes local control. Stated differently, local control is still served if a “cap” exceeding budget is disapproved by a district’s voters. Plaintiffs also claim that the ballot notice itself unreasonably deters school boards and taxpayers from seeking a tax levy in excess of the statute’s threshold. Understanding what is required to approve a proposed cap-exceeding budget might influence the way a voter votes, but only in an unpredictable way; some may be inspired to make sure the budget passes, and vote in favor; others may be inclined to vote against simply because the budget seems excessive. Here, the challenged provision merely requires that a valid statement of the law be included in the budget proposition, which is not actionable. All of plaintiffs’ Education Article claims are therefore dismissed.
Equal Protection
New York’s Equal Protection Clause states: “No person shall be denied the equal protection of the laws of this state or any subdivision thereof.” (NY Const, art I, § 11.) The Equal Protection Clauses in the Federal and New York State Constitutions *264 are protective of the same rights. (Hernandez v Robles, 7 NY3d 338, 362 [2006].)
As noted in oral argument, plaintiffs are asking this court to make a decision that “flies in the face” of established case law. Counsel acknowledged that asking the court to declare that education is a fundamental right is essentially a preservation strategy, in that many states have changed their views on the subject in the time since Levittown, and that the time may be right in this state to revisit the issue. However, the current state of the law requires this court to find that education is not a fundamental right, and that rational basis is the proper test to apply to an equal protection challenge. (Levittown, 57 NY2d at 43, citing San Antonio Independent School District v Rodriguez, 411 US 1.) Under that test, any conceivable rational basis is sufficient to sustain the statute’s constitutionality. The rational basis test “does not pass judgment upon the wisdom, fairness, or logic of legislative decisions; it turns on whether there are ‘plausible’ reasons for [the legislature’s] choices.” (Weinstein v Albright, 261 F3d 127, 140 [2d Cir 2001] [citation omitted]; see also Brown v Board of Educ., Whitesboro Cent. School Dist., 88 AD2d 184, 186-187 [3d Dept 1982].) Defendants argue that
“it is at least conceivable that the Legislature believed that [an] alarming increase in real property taxes was driving business and jobs from New York State to less taxing jurisdictions, and dampening economic activity in the State. Enacting legislation aimed at curtailing the growth of real property taxes in the State is certainly a rational reaction to the growing tax problem.”
Plaintiffs claim that the statute fails the rational basis test, because linking the cap to inflation is irrational, based on the inequality in funding and educational opportunity across the state’s school districts. However, this amounts to a critique of the wisdom and fairness of the proposal; the court finds that the State obviously has a legitimate interest in retaining jobs and business here in New York, and that this constitutes a plausible reason for the statute.
In plaintiffs’ fourth cause of action, it is alleged that the tax cap violates plaintiffs’ right to equal protection by classifying and treating voters unequally. Specifically, the classes are school district residents voting on and benefitting from education funding versus nonschool residents who, through their elected repre *265 sentatives, vote upon, and benefit from, non-education funding. Plaintiffs claim that once a nonschool budget containing a tax levy in excess of the cap is devised by a town board, that same board may meet the supermajority requirement with a simple majority vote. Contrasted with school district residents, those voters are subjected to the additional hurdle of reaching the supermajority threshold by popular vote in order to raise education funds above the cap.
A violation of equal protection arises where “first, a person (compared with others similarly situated) is selectively treated and second, such treatment is based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.” (Matter of State of New York v Myron P., 20 NY3d 206, 211 [2012].) Even if the court could find that the town boards and those that vote on school district budgets were “similarly situated” in that they both can be categorized as involving budget approval, the court cannot conclude that they are being treated differently under the statute. Rather, the tax cap’s supermajority requirement applies to both. Plaintiffs’ claim amounts to an “uneven effects” argument, upheld by the Supreme Court in Personnel Administrator of Mass, v Feeney (442 US 256, 271-272 [1979] [finding no violation resulting from “uneven effects” where “the law itself treats (the classes) no differently from all other members of the class described by the law”]; see also Silberman v Biderman, 735 F Supp 1138, 1148 [ED NY 1990] [“the test is not whether a classification generates a harsh result for an individual or group within a class, but rather the evenhandedness of treatment of the class itself’]).
In their sixth cause of action, plaintiffs challenge the 60% supermajority requirement on equal protection grounds asserting that the “votes of those who favor exceeding the tax cap are given zh the weight of those who oppose exceeding the cap.”
As noted by the defendants, Gordon v Lance (403 US 1, 5, 6 [1971]) upheld a 60% voting requirement because it did not single out a “ ‘discrete and insular minority’ for special treatment,” and therefore did not violate the Equal Protection Clause. The Gordon Court held that it did not matter that the supermajority requirement caused the majority’s voting power to be diluted because nothing “requires that a majority always prevail on every issue,” including decisions about levying school taxes. (Id. at 5-6.) One week after it decided Gordon, the Court *266 summarily affirmed a three-judge federal panel’s decision in Brenner v School Dist. of Kan. City, Mo. (315 F Supp 627 [WD Mo 1970]). (See Brenner v School Dist. of Kan. City, Mo., 403 US 913 [1971].) That lower court addressed Missouri’s constitutional and statutory provisions which required two-thirds voter approval for elections concerning school taxes and bond issues. At one election a school-tax proposal obtained a majority but fell short of the required two-thirds vote, and at another election a school-bond proposal suffered the same result. (Brenner, 315 F Supp at 627-628.) After an action was filed in federal district court to invalidate both measures on the ground that the two-thirds voter approval requirement violated the Equal Protection Clause, the three-judge federal panel dismissed the action and ruled that Missouri’s supermajority voter approval requirements were constitutional. The panel in Brenner distinguished prior U.S. Supreme Court voting cases on the ground that they dealt with statutes invidiously discriminating against classes of voters that were defined by their preexisting status (e.g., race, religion, poverty, place of residence) whereas “[t]he extraordinary two thirds majority requirement” related to Missouri’s school-tax levies “obviously involves no possible classification until after all votes are cast and counted because no one can know who may have voted ‘yes’ or ‘no’ until that time. And even then, no one is supposed to know who voted which way.” (Id. at 635-636, 635 n 10.) The U.S. Supreme Court summarily affirmed the Brenner holding, citing back to Gordon. (Brenner, 403 US 913.)
“ ‘[T]he basic concern of the Equal Protection Clause is with state legislation whose purpose or effect is to create discrete and objectively identifiable classes.’ ” (Cheeseman v Bellacosa, 130 AD2d 920, 922 [3d Dept 1987], quoting San Antonio Independent School Dist. v Rodriguez, 411 US 1, 60-61 [1973, Stewart, J., concurring].) The instant plaintiffs do not allege that the state legislature’s intent in implementing the supermajority requirement of the tax-cap was based on impermissible considerations such as race, religion, alienage or gender. Rather, plaintiffs allege that the challenged provision interferes with a “fundamental liberty” related to voting. However, the plaintiffs’ argument suffers from the same infirmities as identified in Brenner, specifically, that there is no allegation of discrimination against a preexisting classification of people because the voters classify themselves, and only after they vote in secret. As noted by the defendants,
*267 “people of color, poor people, and people in different parts of any particular school district can be—and most certainly will be—on different sides of any particular school budget vote; thus, there is no discrete and objectively identifiable class of protected voters that are impacted by the tax cap’s supermajority provision.”
Accordingly, all of the plaintiffs’ equal protection claims are dismissed.
The Right to Vote
In a separate cause of action, plaintiffs also allege that the supermajority requirement violates the principle of “one-person, one-vote.” As noted above, in Brenner, the federal court stated that the “one-person, one-vote” principle simply did not apply to school-tax levy referendums that necessitated supermajority approval. That court held that
“[t]he reapportionment cases ultimately speak to the issue of equality of representation, not equality of vote. ... In the case of a . . . referendum . . . , the principle is inapposite, since the voters are deciding only whether they should tax themselves; full and effective participation already is guaranteed because the voters are exercising the franchise directly, rather than through representatives casting vicarious votes in the legislature. Since the consequences of electing a representative differ significantly from those of a . . . referendum, what is necessary to guarantee fairness in one should not be applied automatically to the other. . . . [Thus] the Supreme Court’s articulation of the ‘one-[person], one-vote’ apportionment principle does not carry with it, either implicitly or explicitly, a federal Constitutional command that all State school bond and tax levy elections must be decided by a simple majority vote of the voters participating in such an election.” (Brenner, 315 F Supp at 635.)
Further, as noted by the Court in Gordon, so long as a “discrete and insular minority” has not been singled out for special treatment, “there is nothing in the language of the Constitution, our history, or our cases that requires that a majority always prevail on every issue.” (Gordon, 403 US at 5-6.) Plaintiffs argument that a class of persons has been singled out here, namely, those who would benefit from the operation of the statute to enjoy its benefits, as opposed to those who would op *268 pose the operation of the statute, is without merit for the same reasons as stated above.
Therefore, this cause of action is likewise dismissed.
Freedom of Expression
Plaintiffs’ seventh cause of action alleges that the tax cap statute violates the First Amendment of the US Constitution and article I, § 8 of the New York State Constitution in three ways: (1) it diminishes their voting power as compared to those who oppose increased spending; (2) it requires the placement of an anti-increase message on ballots, effectively encouraging voters to vote “no”; and (3) it imposes adverse consequences on school boards and voters who try, unsuccessfully, to pierce the cap. These three impairments violate plaintiffs’ right to free speech.
The court has already addressed the first issue, and finds that the plaintiffs’ argument lacks merit for the same reasons as stated above.
With respect to the second issue, the ballot states that “[a]doption of this budget requires a tax levy increase of_ which exceeds that statutory tax levy increase limit of_for this school year and therefore exceeds the state tax cap and must be approved by sixty percent of the qualified voters present and voting.” Plaintiffs claim that the notice is not viewpoint neutral and is meant to discourage voters from approving a proposal to exceed the tax cap.
Defendants cite a similar set of facts in Caruso v Yamhill County ex rel. County Commr. (422 F3d 848 [9th Cir 2005], cert denied 547 US 1071 [2006]), wherein the Ninth Circuit approved a provision similar to the ballot language at issue in Education Law § 2023-a (6) (b). There, the plaintiff challenged an Oregon statute that required what was called a “three-percent warning” on ballot initiatives proposing to increase local property taxes. Whenever such an initiative impacting property taxes was placed on a ballot for voter approval, the Oregon statute under review required that the following language appear on the ballot along with the initiative: “This measure may cause property taxes to increase more than three percent.” (Caruso, 422 F3d at 851.) The plaintiff in Caruso alleged that this language resulted in a First Amendment violation. The Ninth Circuit noted that “strict scrutiny” was not applicable to the plaintiffs claim and that rather a “ ‘more flexible’ standard” applied to this type of election law because “ ‘[c]ommon sense, *269 as well as constitutional law, compels the conclusion that government must play an active role in structuring elections.’ ” (Caruso, 422 F3d at 855.) Second, the court noted that the Oregon statute passed constitutional muster because it regulated “the political process more than it [did] political speech” since the provision regulated “only what [was] said through the ballot itself.” (Caruso, 422 F3d at 856, citing Timmons v Twin Cities Area New Party, 520 US 351, 362-363 [1997], Rubin v City of Santa Monica, 308 F3d 1008, 1015 [2002] [“Courts will strike down state election laws as severe speech restrictions only when they significantly impair access to the ballot, stifle core political speech, or dictate electoral outcomes”].) Third, the court noted that “[a]ll other means of communication, including the ‘interactive’ discussions for which First Amendment protection is ‘at its zenith,’ ” fell outside the scope of the Oregon law. (Caruso, 422 F3d at 856.) Finally, referring to the “three-percent warning” language as merely an “accurate reminder” to voters (id. at 859), the appellate court then went on to hold that the law served the important State interest of informing the electorate of the tax-related impact of initiatives.
The court agrees with the rationale as set forth in Caruso that the ballot statement required by Education Law § 2023-a (6) (b) governs the ballot process, and in no way regulates speech. Plaintiffs are free to engage in a vast assortment of fullthroated campaign activities favoring whatever school-tax measures they choose. Further, the court finds that the language conveys neutral facts which are necessary to inform the voter of the impact of their vote.
Finally, plaintiffs claim that the tax cap chills the speech of pro-education voters by imposing adverse consequences if an attempt to pierce the cap fails. Plaintiffs claim that this “poison pill” is a hindrance to political conversations and the exchange of ideas, as it is designed to preclude districts from even raising the idea of a cap piercing budget to allow the voters to have a political conversation about it. The court finds that this supposition is factually inaccurate. The “idea” of a cap piercing budget can be raised twice before the voters. Even if Education Law § 2023-a (6) (b) in particular, and the supermajority requirement of the tax cap in general, makes it more difficult for plaintiffs’ positions to succeed, this is irrelevant under a First Amendment analysis since there is nothing stopping the plaintiffs from making their case to the voting public in whatever ways they might choose.
*270 The court therefore dismisses the plaintiffs’ right to vote claims.
Substantive Due Process
The court first notes that while the defendants’ motion to dismiss addressed procedural due process claims, it does not appear that the plaintiffs are making any such arguments. Their brief in opposition only addresses substantive due process, and plaintiffs’ counsel only addressed substantive due process claims at oral argument. To the extent that the complaint contains any procedural due process claims, the court finds that they have been abandoned.
Plaintiffs claim that the statute violates their vested liberty interests in the right to provide and receive education, the right to vote and to free expression.
Generally, the court grants broad deference to the legislature and requires that laws merely be rational in relation to a legitimate governmental purpose. (Shaughnessy v United States ex rel. Mezei, 345 US 206, 222 [1953].) However, when a law infringes on a substantive aspect of liberty or fundamental rights, the state must narrowly tailor that law “to serve a compelling state interest.” (Reno v Flores, 507 US 292, 301-302 [1993].) Substantive due process protection is reserved for egregious abuses of governmental power shocking to the judicial conscience. (County of Sacramento v Lewis, 523 US 833, 847 [1998]; United Artists Theatre Circuit, Inc. v Township of Warrington, PA, 316 F3d 392, 394-395 [3d Cir 2003].) In Washington v Glucksberg (521 US 702, 720-721 [1997]), the Court noted that
“we ha[ve] always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended. By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the members of this Court.” {Id. at 720 [internal quotation marks and citations omitted].)
One of the oldest liberty interests recognized by the Supreme Court under the theory of substantive due process is the inter *271 est that parents have in the care, custody, control, and management of their children, including the right of parents to control their education. (Troxel v Granville, 530 US 57, 65 [2000]; Santosky v Kramer, 455 US 745, 753 [1982]; Prince v Massachusetts, 321 US 158, 164 [1944]; Pierce v Society of Sisters, 268 US 510, 534-535 [1925] [striking down a law which prohibited parents from sending their children to private or parochial schools]; Meyer v Nebraska, 262 US 390, 399 [1923] [striking down a law which restricted foreign-language education].)
The above-cited case law establishes that the boundaries of this right have not been comprehensively defined, but plaintiffs cite no authority wherein any court has held that a statute similar to the one at issue has violated or even interfered with a parent’s fundamental right to direct a child’s education. The laws in Meyer and Pierce were struck down as they constituted a complete prohibition on parents’ ability to make basic and personal choices about their child’s education. This court is reluctant to hold that a statute which still places the ability to control a school budget in the hands of voters, albeit by a super-majority margin, infringes or interferes with the liberty of parents and guardians to direct the upbringing and education of children. If the court were to accept this logic, then even a majority vote could be said to interfere with the liberty interests of certain parents, in the minority, to direct their child’s education. The court does not find that the statute constitutes a “deprivation” of any liberty interest, and thus, there can be no substantive due process violation.
The Supreme Court has also recognized that the rights contained in the first eight amendments to the constitution fall under substantive due process, including the right to vote and free expression. (United States v Carolene Products Co., 304 US 144 [1938].) However, as noted above, the court does not find that plaintiffs have been deprived of these rights either.
Therefore, the court finds that the plaintiffs have failed to state a cause of action under substantive due process.
In accordance with the foregoing, all causes of action currently contained in the complaint are dismissed.
The Motion to Amend
As previously noted, the plaintiffs have a motion to amend the complaint pending concerning the recently enacted “tax freeze” legislation, which provides a tax credit to property taxpayers in school districts that adopt budgets that do not *272 exceed the cap. Leave to amend is to be freely granted “at any time,” so long as there is no prejudice or surprise to the other party (CPLR 3025 [b]; see Webber v Scarano-Osika, 94 AD3d 1304, 1305 [3d Dept 2012]), “and the amendment is not plainly lacking in merit” (Paolucci v Mauro, 74 AD3d 1517, 1519 [3d Dept 2010] [internal quotation marks and citations omitted]). Defendants do not assert any prejudice or surprise, nor do they argue that the proposed amendments are patently without merit. Further, the court finds that requiring plaintiffs to commence a new action would waste time and resources. Therefore, plaintiffs’ motion to amend the complaint is granted, without costs, and the amended complaint should be served forthwith upon the entry of an order herein.